No. 97-288

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 165

WILLIAM R. RICHTER and CAROL ANNE RICHTER,

Plaintiffs and Respondents,

v.

JOSEPH C. ROSE and LOIS F. ROSE,

husband and wife,

Defendants and Appellants.

APPEAL FROM: District Court of the Eleventh Judicial District,

In and for the County of Flathead,

The Honorable Ted O. Lympus, Judge presiding

COUNSEL OF RECORD:

For Appellants:

Marshall Murray, Attorney at Law, Kalispell, Montana


For Respondents:

Thomas R. Bostock; Warden, Christiansen, Johnson & Berg,

Kalispell, Montana


Submitted on Briefs: June 18, 1998

Decided: June 30, 1998

Filed:

_____

Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

¶1 William R. and Carol Anne Richter (the Richters) brought the underlying action against Joseph C. and Lois F. Rose (the Roses) seeking a declaration that a public right-of-way had been established across the Roses' property in the early 1900s or, alternatively, a condemnation order granting them an easement across the Roses' property. The Eleventh Judicial District Court, Flathead County, rejected the Richters' public right-of-way claim but entered a preliminary condemnation order and judgment in their favor.

¶2 The Roses appeal from that order and judgment and from the subsequent denial of their motion to amend the conclusions and judgment, contending that the District Court erred in concluding that the Richters' property is a farm for eminent domain purposes and, because it did not have jurisdiction over the issue of necessity, further erred in issuing the preliminary condemnation order. We reverse the District Court's conclusion that the Richters' property is a farm for eminent domain purposes and, therefore, we need not reach the issue relating to the issuance of the preliminary condemnation order.

¶3 The Richters cross appeal from the District Court's conclusion that they did not establish the existence of a public right-of-way by a preponderance of the evidence. We affirm on the cross appeal.

## BACKGROUND

¶4 Francis and Lois O'Connell (the O'Connells), Carol Richter's parents, obtained Government Lot 10 of Section 1, Township 31 North, Range 20 West, Flathead County (Lot 10) at a sheriff's sale in 1958 and gifted it to the Richters in 1971. Lot 10 consists of 133.47 acres of alternating meadow and timberland that has been used primarily for recreational purposes by both the O'Connells and the Richters. Neither couple had deeded land access to Lot 10.

¶5 Lot 10 is bounded to the north and west by property owned by the Roses and to the south by property owned by the Roses and by several smaller properties, the owners of which were not named as defendants in this suit. The North Fork of the Flathead River forms the eastern boundary of Lot 10 and has provided the only access to Lot 10. The portion of the Roses' property across which the Richters seek access is described as Government Lot 2 and the Southwest Quarter of the Northeast Quarter and the Northwest Quarter of the Northeast Quarter of Section 12, Township 31 North, Range 20 West (Lot 2).

¶6 The Richters first sought to obtain deeded land access to Lot 10 in 1990, when they contacted Joseph Rose about purchasing an easement across the Roses' property. Discussions continued for several months, during which time the Richters obtained a survey of Lot 10 at Joseph Rose's request. Joseph Rose then proposed a location for the easement and a price of approximately $2,000 was discussed. The Richters' attorney submitted a written easement agreement to the Roses in 1991.

¶7 In the interim, and acting on their belief that they had viable access to Lot 10, the Richters hired professional forester Phillip Healey (Healey) in 1991. Healey analyzed and evaluated the timber resources on Lot 10 and concluded that there was merchantable timber on Lot 10 requiring management. He further concluded that land access to Lot 10 was necessary for the economical management and extraction of the timber.

¶8 The Roses refused to sign the written easement agreement and the Richters filed the present action seeking a declaration that a public right-of-way exists across the Roses'

property or, alternatively, to condemn an easement for an authorized public use. The Richters' complaint also included breach of contract and trespass claims.

¶9 The Richters presented considerable historical evidence at trial relating to their theory that a public right-of-way was established across the Roses' property in the early 1900s. Carol Richter also testified that the Flathead County Attorney had found no evidence of either the existence or the abandonment of such a public right-of-way. Because the statutes applicable to eminent domain require the party attempting to condemn property via eminent domain to take certain steps prior to filing a condemnation action, the Richters both testified to the steps they had taken. William Richter stated that he had negotiated with Joseph Rose regarding an easement and the Richters' attorney had submitted an offer for a written easement agreement. He also stated that Lot 10 consists half of grazing land and half of timber land. According to Carol Richter, the crops raised on Lot 10 are timber and grass.

¶10 The District Court concluded that the Richters did not establish the existence of a public right-of-way across the Roses' property. It found, however, that the only reasonable or practical means of access to Lot 10 is across the Roses' property and ultimately concluded that the Richters were entitled to condemn an easement across the Roses' property. Its conclusion was based, in part, on its determination that the Richters' property is a farm.

¶11 The District Court issued a preliminary condemnation order and ordered the Roses to file a statement of claim of just compensation. The Roses subsequently moved to amend the District Court's conclusions and judgment and the motion was deemed denied when the District Court failed to rule on it within 60 days. The Roses appeal and the Richters cross appeal.

## STANDARD OF REVIEW

¶12 The parties' challenges are directed primarily to conclusions of law made by the District Court. We review a district court's conclusions of law to determine whether the interpretation of the law is correct. St. John v. Missoula Elec. Co-Op., Inc. (1997), 282 Mont. 315, 320, 938 P.2d 586, 588 (citations omitted).

¶13 The Roses also appeal from the denial of their motion to amend the findings of fact, conclusions of law, and judgment. Our standard in reviewing the denial of a motion to

amend is whether the district court abused its discretion. Hickingbotham v. Duncan (1995), 271 Mont. 525, 529, 898 P.2d 1215, 1217 (citation omitted).

## *DISCUSSION*

¶14 **1. Did the District Court err in concluding that Lot 10 is a farm?**

¶15 Eminent domain is the right to take private property for a public use. Section 70-30-101, MCA. In Montana, the procedures for taking property pursuant to eminent domain are entirely statutory. *See* §§ 70-30-101, MCA, *et seq.* Among the public uses on behalf of which the right of eminent domain may be exercised are private roads leading to farms or residences. Section 70-30-102(6), MCA.

¶16 In this case, the Richters sought to exercise the right of eminent domain to obtain an easement interest across Lot 2 for a private road to Lot 10. They contended that Lot 10 is a farm under § 70-30-102(6), MCA. The District Court applied the definition of "farm" set forth in § 72-16-331(7), MCA, as "truck farms, ranches, nurseries, ranges, greenhouses, orchards, woodlands, or structures used primarily for raising agricultural or horticultural commodities" and concluded that Lot 10 is a farm because it consists of woodlands with marketable timber. The Roses contend that the District Court erred in relying on the definition of farm contained in § 72-16-331(7), MCA.

¶17 Title 70, Chapter 30, MCA, does not define "farm." "Farm" is defined in several other locations in the MCA, however, and when a word is defined in any part of the MCA, the same definition applies wherever the word appears unless "a contrary intention plainly appears." *See* § 1-2-107, MCA.

¶18 Here, the District Court applied the definition of farm contained in § 72-16-331(7), MCA. However, § 72-16-331, MCA, limits application of the definitions contained therein to §§ 72-16-331 through 72-16-349, MCA, which involve valuation for probate purposes. The legislature having clearly expressed its intention that the definition of "farm" contained in § 72-16-331(7), MCA, applies only to certain sections within the Montana Probate Code, that definition cannot properly be applied in the context of § 70-30-102, MCA. Therefore, we hold that the District Court erred in doing so.

¶19 For similar reasons, none of the other statutory definitions of farm advanced by the parties in the District Court and this Court are applicable in defining "farm" for purposes

of § 70-30-102(6), MCA. The definitions of farm contained in § 39-3-402, MCA, apply only to Part 4 of Title 39, Chapter 3, which pertains to minimum wage and overtime compensation. Similarly, the definition of farm contained in § 39-51-205(3), MCA, is limited to use "in this section[.]" Thus, as was the case with the definition of farm contained in § 70-16-331(7), MCA, the legislature clearly expressed its intention that the definitions contained in §§ 39-3-402 and 39-51-205(3), MCA, are limited in their application and cannot properly be used in defining "farm" for purposes of § 70-30-102 (6), MCA.

¶20 Nor does the definition of "farm operation" contained in § 70-31-102(6), MCA, apply. On the face of it, "farm operation" and "farm" are not necessarily equivalent terms and, in any event, we cannot simply impose the definition of a different term on the word "farm" contained in § 70-30-102(6), MCA. Moreover, § 70-31-102, MCA, provides that the definitions contained therein apply only to Chapter 31, which relates to relocation assistance for condemnees. Thus, the legislature again clearly expressed its intention that the definitions contained in § 70-31-102, MCA, are limited in their application.

¶21 Since farm is not defined for purposes of § 70-30-102(6), MCA, and other definitions advanced are not applicable, we must construe the term according to its plain meaning. *See* § 1-2-106, MCA; State v. Nye (1997), 283 Mont. 505, 510, 943 P.2d 96, 99 (citations omitted). The dictionary definition of farm is "[a] tract of land cultivated for the purposes of agricultural production. . . ." *American Heritage Dictionary* 661 (3d ed. 1992). Cultivate is defined as "[t]o improve and prepare (land), as by plowing or fertilizing, for raising crops; till. To dig or loosen soil around (growing plants). To grow or tend (a plant or crop). . . ." *American Heritage Dictionary* 454 (3d ed. 1992).

¶22 Obviously, Lot 10 is a tract of land. However, the Richters have not prepared, fertilized or tilled the soil on Lot 10 or otherwise cultivated the land for agricultural purposes. Nor have they cited to any authority under which naturally-occurring grasslands and timber are "crops" in the ordinary meaning of that word. Thus, we conclude that Lot 10 is not a "farm" within the plain meaning of that term.

¶23 We hold, therefore, that the District Court erred in concluding that Lot 10 is a farm under § 70-30-102(6), MCA, for purposes of exercising the right of eminent domain and, as a result, we further hold that the Richters failed to establish a public use on behalf of which eminent domain could be exercised. Finally, we hold that the District Court's deemed denial of the Roses' motion to amend to conclude that the Richters' property was

not a farm for eminent domain purposes constituted an abuse of discretion.

¶24 **2. Did the District Court err in concluding that the Richters failed to establish the existence of a public right-of-way across the Roses' property by a preponderance of the evidence?**

¶25 The Richters' primary access theory at trial was that a road running from Blankenship Road, a county road, across the Roses' property to Lot 10 was established by use as, and remains, a public highway pursuant to Revised Statute § 2477 (R.S. § 2477) or by common law dedication. The Richters introduced documentary evidence in support of this theory, including land patents and land patent applications. The land patents, by which public lands were granted to an individual, were used by the Richters to show when land was removed from the public domain. According to the Richters, because a wagon road was shown on certain land patent applications and the settlers needed to get to Columbia Falls, the settlers were likely to have used the wagon road to get to Columbia Falls and, therefore, a public highway was created by use.

*R.S. § 2477*

¶26 The District Court concluded that the Richters had failed to establish the existence of a public right-of-way across the Roses' property pursuant to R.S. § 2477 by a preponderance of the evidence. The Richters argue that the District Court's conclusion is incorrect and that the public right-of-way established pursuant to R.S. § 2477 still exists.

¶27 R.S. § 2477 (subsequently renumbered 43 U.S.C. § 932) granted "[t]he right of way for the construction of highways over public lands, not reserved for public uses. . . ." 43 U. S.C. § 932 (repealed October 21, 1976 by Pub.L. 94-579). Its purpose was "to enable the public to acquire a roadway over public lands." City of Butte v. Mikosowitz (1909), 39 Mont. 350, 355, 102 P. 593, 595. We have long recognized, however, that the grant set forth in R.S. § 2477 "is but an offer of the right of way for the construction of a public highway on some particular strip of public land, and can only become fixed when a highway is definitely established and constructed in some one of the ways authorized by the laws of the state in which the land is situated." State v. Nolan (1920), 58 Mont. 167, 173, 191 P. 150, 152. Therefore, we turn to Montana law to determine whether a public highway was established across what is now the Roses' property in the early 1900s so as to constitute the acceptance of the right-of-way offered via R.S. § 2477.

¶28 Prior to 1895, a public highway could be established in Montana in four different ways: 1) by action of the proper authorities in accordance with statutory provisions; 2) by prescriptive use for the period of time required by statute; 3) by opening and dedication by the private owner; and 4) on partition of real property. *Nolan*, 58 Mont. at 173, 191 P. at 152. In 1895, however, § 2603 of the Political Code of Montana (§ 2603) became effective. Section 2603 provided that "no route of travel used by one or more persons over another's land shall hereafter become a public road or by-way by use, or until so declared by the Board of Commissioners or by dedication by the owner of the land affected[;]" as a result, use alone was insufficient to establish a public highway after 1895. *Nolan*, 58 Mont. at 173, 191 P. at 152. By 1907, this statute had been renumbered as § 1340 of the Revised Code of 1907 and, in 1913, it was amended to delete the prohibition against creating a public highway by use alone. *See* Maynard v. Bara (1934), 96 Mont. 302, 306, 30 P.2d 93, 95 (citation omitted). Thus, a public highway could not be established by prescriptive use between 1895 and 1913 unless the "use was accompanied by some action on the part of the public authorities having jurisdiction of the subject, tantamount to a declaration that the particular road was a public highway." *Maynard,* 96 Mont. at 306, 30 P.2d at 95 (citing *Nolan*, 58 Mont. at 173, 191 P. at 152). As a result, the offer of a public right-of-way under R.S. § 2477 could not be accepted--and a public right-of-way established thereby--by use alone between 1895 and 1913. *Maynard*, 96 Mont. at 306, 30 P.2d at 95; *Nolan*, 58 Mont. at 173, 191 P. at 152.

¶29 Here, Carol Richter admitted that no record existed of any action on the part of the County Commissioners to declare that any road across the Roses' property was a public highway. Consequently, the § 2603 requirement of action by the governing authorities was not met. As a matter of law, therefore, the Richters' evidence of use alone was insufficient to establish that a public road or right-of-way had been created across what later became the Roses' property between 1903 and 1907.

¶30 The Richters do not address § 2603. Instead, they contend that § 2600 of the Political Code of Montana (§ 2600), also enacted in 1895, authorized the creation of a public highway across private land by use alone. From that initial premise, they point to our statement in *Mikosowitz* that a public highway across public land can be created in the same manner a public highway can be created over private land *(see Mikosowitz*, 39 Mont. at 355, 102 P. at 595) and, packaging these two contentions together, posit that a public highway across the Roses' property could be--and was--created by use between 1903 and 1907. The Richters also argue under *Mikosowitz* that, once the public has accepted the offer of a grant of a public right-of-way by constructing a highway, anyone taking the land

after such acceptance takes the land subject to the public right-of-way. We need not address the Richters' *Mikosowitz*-related theories because it is clear that their interpretation of § 2600, on which the rest of their argument is based, is incorrect.

¶31 Section 2600, enacted in 1895, provided that all highways "now traveled or used by the public, or if laid out or erected by others, dedicated or abandoned to the public . . . are public highways." The statute clearly declared that certain highways existing in 1895--including those merely "used by the public"--were public highways. It did not provide the methods by which public highways could be established subsequent to that time. As discussed above, § 2603 addressed that issue and provided that use alone was not sufficient to establish a public highway between 1895 and 1913; thereafter, the successor statute to § 2603 was amended to delete the requirement that some official act was required, in addition to mere use, before a public highway could be created. *Maynard*, 96 Mont. at 306, 30 P.2d at 95; *Nolan*, 58 Mont. at 173, 191 P. at 152-53.

¶32 The Richters admit that Clinton White (White), who homesteaded his property beginning in 1902, was the first settler in the area who would have used the alleged road. Because any use by White occurred after 1895, § 2600 provides no support for the Richters' argument that a public highway was established across the Roses' property between 1903 and 1907. We hold, therefore, that the District Court correctly concluded that the Richters did not establish the existence of a public highway pursuant to R.S. § 2477 by a preponderance of the evidence.

## *Common Law Dedication*

¶33 The District Court also rejected the Richters' alternative access theory, concluding that they did not establish the existence of a public right-of-way across the Roses' property pursuant to common law dedication by a preponderance of the evidence. The Richters again contend that the District Court erred, but we disagree.

¶34 While R.S. § 2477 provided a method for establishing a public highway across public land, common law dedication provided a method for establishing a public highway across private land. Two elements were required to establish a common law dedication: first, an offer by the owner evidencing his intention to dedicate; and second, an acceptance by the public. Kaufman v. City of Butte (1914), 48 Mont. 400, 407, 138 P. 770, 771 (citations omitted).

¶35 In this case, Lena Zorzi (Zorzi) purchased her land from the federal government and received her land patent in 1906, thereby removing Lot 2 from the public domain. There is no evidence in the record indicating that Zorzi took any action expressing an intent to dedicate a part of Lot 2 to the public for use as a road. Thus, the Richters failed to establish the first element necessary to establish a common law dedication. *See Kaufman*, 48 Mont. at 407, 138 P. at 771.

¶36 The Richters rely on the United States Supreme Court's discussion in McKey v. Hyde Park (1890), 134 U.S. 84, 10 S.Ct. 512, 33 L.Ed 860, however, in arguing that dedication can be inferred from use over a long period of time with the owner's consent. Their reliance on *McKey* is misplaced.

¶37 In *McKey*, the plaintiff was a minor living in another state at the time the village began to use his property as a road. *McKey*, 134 U.S. at 86-87. The village argued that the property over which its street ran had been acquired by common law dedication because the minor knew of the use, consented to it, and had not acted more quickly upon reaching majority. *McKey*, 134 U.S. at 92. The Supreme Court concluded that, under Illinois law, dedication could be inferred from long use to which the owner had consented. *McKey*, 134 U.S. at 98. Under Montana law, however, some offer or action indicating an intent to dedicate the property is required to establish a public highway by common law dedication. *Maynard*, 96 Mont. at 310, 30 P.2d at 96 (citations omitted); *see also Kaufman*, 48 Mont. at 407-08, 138 P. at 771. As a result, *McKey* is inapplicable here.

¶38 Therefore, we hold that the District Court correctly concluded that the Richters failed to establish the existence of a public right-of-way pursuant to common law dedication by a preponderance of the evidence.

¶39 Affirmed in part and reversed in part.

/S/ KARLA M. GRAY

We concur:

/S/ JAMES C. NELSON

/S/ WILLIAM E. HUNT, SR.

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER

Chief Justice J. A. Turnage dissenting:

¶40 I respectfully dissent from the Court's conclusion that Lot 10 is not a farm.

¶41 The District Court found that the Richters had engaged a specialist to provide a timber management plan for Lot 10 and that they had commenced to harvest the timber crop, which they are not now able to remove from the property without a useable right-of-way. The court's finding is supported by substantial credible evidence.

¶42 Silviculture is "[t]he care and cultivation of forest trees." *American Heritage Dictionary* 1682 (3d ed. 1992). I submit that property used for purposes of silviculture, or, in the common vernacular, as a "tree farm," may be considered a "farm" within the plain meaning of that word. When, as here, designation as a "farm" determines whether property owners have a right to access their property or do not have that right, I would construe "farm" generously. I would uphold the conclusion of the District Court that Lot 10 is a farm under § 70-30-102(6), MCA, for purposes of exercising the right of eminent domain.

/S/ J. A. TURNAGE